Good afternoon. We have four argued cases this afternoon. The first of these is No. 2009-1052, St. Clair Property v. Canon Inc., and it's Mr. Routh. Am I pronouncing that correctly? It's Routh, Your Honor. Routh, okay. Good afternoon, Your Honors. I'm Stephen Routh. I'm here with my colleague, Stan Jensen, from Warwick, Arrington, and Sutcliffe, on behalf of the Fujifilm Defendants Repellers. With the Court's permission, I'd like to reserve five minutes of my time for rebuttal, and I also intend to focus my comments on the two central claim construction issues that are presented on the appeal. Can I ask you a question to start out with, which is there are three different sets of claims that use this similar but not identical plurality of different file formats for different types of computer apparatus. Suppose I were to agree with you that one of them needed to be reversed but, say, two of them didn't. Would that necessitate a remand because I looked at the special verdict form, and it seems that the same products were accused of infringing all three, and so I guess my point is if they infringe one, does it matter that they don't infringe the others? Yes, it would, Your Honor. Why? For a variety of reasons. One is that the damages awarded here go from a time period of 1996 up to 2003. Two of the patents in the suit did not issue until 2002 or 2001, so there are damages issues that, if some patents are eliminated, need to be addressed. In addition, depending on the construction that the court ultimately gave, there would be potentially issues of non-infringement and issues of invalidity. Now, the district court construed all seven sets of independent terms, at least on the data format terms that are the first issue. The last question you said, I understand completely your dates question, but why would it matter for invalidity if we changed the construction? At this point, if we were to hold there's non-infringement of one of the claims, it would be irrelevant whether or not that would change the invalidity decision below. I mean, the patent wasn't invalidated, so if we changed the claim construction, why would that necessitate a remand for the court to look at the validity of a patent? The court instructed the jury that on all seven independent terms, the clarifying language that the court used in construing the data format terms was to be applied. This is in the... Yes, but the jury held the patents valid. It did, but it did in light of an instruction that said specifically that for all seven sets of the patents... Yes, but if we only reversed on one, there would be no longer a case or controversy as to that one, and why would it necessitate any kind of remand for reconsideration of validity if we left the claim construction intact as to the others? If the claim construction were left fully intact, in other words, if the court didn't reverse the district court's instruction that the jury should consider all seven terms as being qualified by the statement, computer apparatus are different types within the meaning of the claims if they are loaded with different application software, even if they are otherwise the same. That's a central error we find in the district court's construction, and that's a construction that the district courts had applied to all seven terms. As long as that construction applies, I think those terms, all seven of them, were viewed by the jury in light of that. If that construction were affirmed and everything else about one of the constructions were affirmed, I guess I could imagine that there wouldn't be a need for a new trial other than on at least some potential issues of damages. These patents use somewhat different phraseology, and one of the issues here is whether the phraseology should be construed the same way. I don't necessarily see that the parties during the district court proceedings agreed that all the claim language should be given the same construction, though the district court did do that. So could you address the question, let's assume we were to agree with you that your different types of computer apparatus is limited to different types of computer architecture, and that would mean that there was no infringement of the 459 and the 219, and then the question would be what about the 010 and the 899, which use the somewhat different language, computer formats or plurality of computing image file formats. So what's the basis for construing that language the same way as the apparatus language in the other claims? The district court found that all of the terms were subject to the same invention. Well, I understand that. The patent office and re-exam similarly found that all of the patents had the same basic invention. What had happened is the terms got shorter and they used computer formats as a shorthand for different types of computer apparatus. The specification makes that absolutely clear. I think if you were to depart from the district court's and the patent office's view that these terms all have the same basic scope, you then would have to confront the fact that the specification in several places describes the present invention as being limited to an invention that distinguishes based on computer architecture. Show me where that is. The first place I direct the court's attention is to the abstract. The abstract, which is not discussing an embodiment. It's discussing the entire invention. Well, but nowhere in there does it suggest the present invention is limited, as you suggested. And for us to do some sort of disclaimer or other thing would require a limitation. There are several places in the specification. I'd start with the abstract where, again, the abstract is not limited to describing an embodiment. And it describes it very clearly as having a compression-decompression algorithm that selectively formats the compressed digital image to a compatible format for either IBM computer and related architectures or Apple Macintosh PC architectures. And then it says, and I think this is important, it says, so that the digital image can be directly read into most word processing, desktop publishing, and database software packages. I mention that last part because that's where St. Clair and the district court find most of their support for broader reading. But there are other places where the specification talks about easy incorporation into software. Well, this, the abstract tells you up front, how do they accomplish the easy access into software? And it does it through, it does it through the architecture compatibility. Well, suppose we were to conclude that the claim language in the 010 and the 899 is ambiguous. What weight should we give to the examiner's conclusion in the re-exam? I think the examiner's conclusion should be given deference because it shows how one of reasonable skill in the art reads the patent. But most importantly, the examiner doesn't simply give his opinion based on how he felt that morning, but instead points to nine different places in the specification where the specification makes clear that the invention, the invention as it relates to data formatting is an invention that distinguishes between computer architectures. I didn't, I apologize, I didn't get directly to Judge Moore's question, but if you go next to figure six, figure six is described. Six A, B, or C? Six, just six. And figure six. Okay, wait, which patent? I'm in the, okay, the figure six. Yeah, they all have the same figures, but the 459 is what's in the addendum. Yep. And that's what we're relying on. If you go to column three, lines 23 to 24, figure six is described as an example of the control panel logic in accordance with one aspect of the present invention. Where are you reading from? You said column three. Column three, line 23 to line 24. It's simply the portion of the spec that tells you what the figures are. But that says in accordance with one aspect. That's right, and the specification is very clear in other places that it talks about preferred embodiments, alternative embodiments, different embodiments. If you look at that same column three, figures 2A, 6A, 12, 13, 14, those all describe alternative embodiments. What this describes in the part that deals with figure six is it's figure six is one aspect of the invention, of the present invention. But that doesn't, if you say one aspect of something, that doesn't mean every claim must necessarily include that aspect. It doesn't, but the claims that are asserted here do include that aspect. But that's your whole argument. That presumes that I, you're supposed to show me where the support for your argument is, not tell me to accept your argument and then believe why you think it's support. The support is that this provision tells you that figure six is not simply an alternative embodiment, but it's showing one aspect, one portion of the claimed present invention. Well, maybe, what else do you have? If you go to figure six, you'll see that in fact figure six does show the control panel logic with the switch 17 that has the Apple, the IBM, and the other. So figure six does show the architecture distinction as part of the present invention. Next I would take you, with regard to figure six, to column four, line 68, the very last line. And now the specification talks about figure six more explicitly. It says the compressed digital frame is then formatted into either an IBM PC, such as GIF, or Apple Macintosh, such as PIC2, image file format, depending on the setting selected by the operator for a user, switch 17, figure six. So the specification now tells us figure six is an aspect of the present invention, not an embodiment. It shows us the figure, which shows the architecture-specific selection that can be made on data formatting. And then finally, it describes figure six in a way that tells you very clearly what this invention, the present invention, this aspect of the present invention does. If I were to conclude that one of these terms, for example, plurality of computer image file formats, if I were to conclude the plain meaning of that was file formats, JPEG, MPEG, PIC2, GIF, whatever you pick, if I were to conclude that's all the plain meaning was to cover, would you be arguing to me that the specification here rises to the level of a clear and unmistakable disclaimer such that a limitation would have to be read in that is otherwise not warranted by the plain meaning? I would say that it does that, but I think this Court's precedent showed that looking at the specification, you need to look at it in order to understand what the plain meaning is. And if you look at this specification, and I started with figure six, you'll find the same language with figure seven, with figure 14A, which is described as an aspect of the present invention. Show me what would be the clearest example of clear and unmistakable disclaimer to support your original response to my question. The clearest example, the best one you've got. I think the figure six is absolutely clear. A clear and unmistakable disclaimer? Figure six is a showing of an embodiment of the present invention, but it's not, how is that a clear and unmistakable disclaimer of broader scope? Your Honor, there is no description in this specification of the invention that you're reading in the claims of the 01-08. There's nothing in here about the camera that does what you're saying. Well, then maybe that would be a written description problem, but it wouldn't necessarily be a claims instruction. I think we'd have a written description problem, and generally you would construe the patent to be consistent with the specification. This court's precedents, and I could list them all, find many places where the language of the claim is limited by the context set by the specification, by the description of the present invention in the specification, by the consistent use of examples in the specification. The language here we think is clear of the claims, but even if it's not, the specification is clear, and the prosecution is clear. Computer format language is clear? I'm sorry? The term computer format is clear? You've got a problem that's not so clear, right? It is when you put it in the context of this invention, which is to say if you look at the specification, I'm looking back at some notes I have of the court's Nystrom decision, where a word might not clearly mean coming from a log, but when you put it in the context of the specification, it clearly does. In the context of this specification, computer format can only have meaning if computer means something that modifies what the formats are for, and what's consistently described in the specification is that format to computer match is one of architecture. Again, figure 6, figure 7, figure 14A, figure 14B, all of these tell you what this invention is about. It's not just saying any old computer format. That's not a camera that's under discussion. It's a camera which specifically says you can choose architecture A, architecture B, or architecture C. I was going to go on to a different subject, so if you have other questions. Suppose that the claim actually just said different file formats. It didn't have the word computer, apparatus, anything. It just said different file formats. Would you still be telling us that we had to construe that as file formats that operate on only different architectures? No, I wouldn't. You wouldn't go that far? I wouldn't go that far, and I wouldn't be here because that would clearly have been an invalid patent, as would any patent that took it just back to a computer format that meant just any old computer. The reason why these patents exist, including the 010 and the 899, and have survived re-exam is because the patent office has read them as we read them, in the light of the specification, to have a limit that actually makes them of some novelty. If, indeed, this patent just means any old camera that happens to have a format that will go into a computer, then we have a whole different case on invalidity with description as well as prior art. Let me move you on to the one other subject I want to ask you about. I was very confused from the briefing about this difference between still cameras and cameras that have a movie capability. What is the contention here? Your contention is that even if it has the capacity to produce still pictures, if it has, in addition, the capacity to produce movies, that it's not infringing? It's not infringing if it only has one format for still pictures. The cameras in question, the ones particularly of more recent vintage, have one format for still pictures. They don't have a plurality of formats for still pictures. They have another format for movies. These are two different formats in the camera, which is why St. Clair is able to argue for a plurality of data file formats. Oh, so it's that language that you're arguing about. Well, and even if you do computer formats, there's only one format for still pictures in the camera. Okay, I understand what you're saying. And the reality is that that puts you in a position where a consumer picks up a camera and has a choice, still movie. No choice of formats. No choice of computers. I understand. Are there any other questions? Okay, thank you. We'll restore your rebuttal time. Thank you. May it please the Court, my name is Ron Schutz and I represent St. Clair. I have short-sleeved shirts that I wear in the summer, and I have long-sleeved shirts that I wear in the winter. These analogies are tough to follow. This stuff is hard enough without trying to understand distant analogies. But you go ahead. It's your turn. I think it cuts to the chase here, which is a word that was not mentioned in counsel's argument, and that is the word exclusivity. What they really want this Court to do is say an image file format is tied to one and only one architecture. In other words, you can't wear winter clothes in the summer. In other words, if you've got image file format 1, it will work with computer apparatus 1. And if you've got image file format 2, it will work with computer apparatus 2, but that's it. Image file format 1 cannot be cross-compatible with computer apparatus 2. And likewise, image file format 2 cannot be cross-compatible with 1. You agree that the examiners on the re-exam interpreted the claim language differently, right? Absolutely not. He interpreted the claim language exactly the way Judge Farnan did. If you look at the re-exam, there were four re-exams, for the 459 patent and the 899 patent, there was a rejection based on Hoover. Wait, show me. I've read the file history. Yes. So I'm having trouble understanding what you're saying. Where is it that the examiners adopted your construction? In the re-exam, if you go to the exact site in just a second. So here's what happened in the re-exam. And I believe it's at page 9544. Yes, so here's what happened. If you're in the re-exam in the appendix at page 9544, what you will have is a 102 rejection over a piece of art to Hoover. And what the examiner did was said Hoover anticipates, but this is what's interesting. About halfway down the page, the examiner says, notes that at the time of the invention, at least the tip image file format was platform independent and could be used in either an IBM PC clone or an Apple Macintosh. Therefore, Krueger discloses that the image data can be output in a format readable by a standard computer, such as a tip format, where at least the tip image can be used in one of a plurality of computers. Cross-platform compatibility. Completely opposite of the construction that Fuji wants this court to adopt today, which is either they've characterized it in some briefing as a one-to-one correspondence. Yeah, well, that's interesting language, because that appears in the prosecution history at 9612. So why are they wrong about that? I'm sorry, it appears at 9612. Yeah, one-to-one correspondence with a particular type of computer system appears at 9612. Yes, and that's, again, part of the re-exam file history. Right. And this is what's interesting about this, Your Honor. Well, so that's inconsistent with your argument, right? No, here's what happened in the re-exam. The examiner adopted a position that Sony, which had filed the re-exam, took with regard to the claim. No, just focus on the line. Why is the language there not inconsistent with what you're saying? Because when – oh, that language, that specific language, Your Honor, is in fact inconsistent with the position we're taking here. It's inconsistent with Judge Farman's claim construction, and it's wrong. But when the patent office did what the patent office is charged with doing in a re-exam, which is looking at prior art and applying a claim as construed – Well, why shouldn't we defer to their interpretation? Salazar suggests that examiners are persons of skill in the art, and here's a statement that's inconsistent with your view, and so why not defer to that?  Although we've got arguments that they waived the re-exam, but that's all brief. But we need to go back to what the patent office actually did. In the 459, where – and there's other language where they point out this one-to-one correspondence – that is just basically a kind of a rambling statement by the patent office. When they actually did what they are statutorily tasked with doing, which is applying the claim to a piece of prior art, which they did in Kuberger, they adopted our position that file formats are cross-platform compatible and not linked or exclusive in a one-to-one correspondence. So I would submit that if you do decide to look at what the patent office did in the re-exam, when it came down to what their job was, they in fact applied the same claim construction that Judge Farmer applied in this case. And there are – that's consistent with what the specification says. It's consistent with the plain warning. I don't think there's anything confusing about the language. It's different, you know, data formats for different computers. And contrary to what Fuji would attempt to have this court believe, neither St. Clair nor the district court said in any way that the language in claim of the 459 patent and the 219 patent should be applied to 899 and 010. Well, there's no language in the latter two patents that deal with different computer apparatus. That language is in the first two patents, but it's instructive to look what Judge Farman actually said. In his opinion, and this is at the appendix on pages 22 to 23, Judge Farman said, The court believes claim 16 of the 459 patent is representative of the language on format in the other claims of the patents in suit. And there's a sentence that is irrelevant, and it goes on to say thus, For all the patents in suit, the terms file format, data file format, and data format mean the arrangement of digital data in a file, including image, text, audio, et cetera, MPEG, JPEG, and you list the other ones. So there was no way that Judge Farman thought that the language computer apparatus should be tagged on to 010 and 899. And in fact, the district court separately construed the phrase. Well, that may be, but the question is how do we construe them? That's correct, but there was some questions about whether they should be construed differently, and they use different language. They clearly use different language. To address another point that came up in Fuji's counsel's argument, and Fuji made this point in their brief, they said if the patent claim were merely different computer formats, or in response to Judge Moore's question, if it was just a camera that could output two different file formats, would Fuji contest that? And Mr. Roos said that would be a clearly invalid patent. I would submit to the court that that's the construction that Judge Farman, when he gave the jury the claim construction order, is exactly what he said. If you look at his claim construction order, he construed this phrase, and I'm quoting from the order itself at A2. The phrase, quote, formatting said digital signal in one of the plurality of computer formats means arranging digital data into one of a plurality of image file formats, including at least JPEG, TIFF, GIF, etc. So the claims, as litigated, as applied, were in fact a camera, two different file formats, image file formats, however you want to characterize it. Those claims were upheld, show not to be invalid, in two separate trials, including the trial with Fuji. I'd like to move you on to the issue of damages, if you don't mind. Yes, ma'am. When does the hypothetical negotiation take place for the context of damages? You know, interesting question, and there's been some dispute in the briefing as to when it takes place and who is at the table. I would submit at the end of the day that doesn't matter so much as whether... No, it matters. Our case law says it matters. So when does the hypothetical negotiation take place? At the date of the first infringement, and our position in the briefs, I think, was 19... November 1994. That's correct. So November 1994, did St. Clair own the patents at that time? They did not. Right. So PPC... PCC, Personal Computer Camera. Got it. PCC owned the computers at that point in time. So why wouldn't the hypothetical negotiation be the negotiation that would have taken place between PCC, since our precedent binds us to the time of the first infringement, which you all allege is November 1994. So why wouldn't we look at the person who actually owns the patent and what they would have licensed it for? You do, but there's an additional fact that's important here. And that additional fact is that at the time, St. Clair was an investor in PCC, and PCC would have had the benefit of one of the very active participants from St. Clair, Mr. Ed Chung, in those negotiations, and he was very experienced. So Mr. Wagner, when he testified, I think basically mentioned that fact and said it doesn't really matter because they would have had the benefit of that. But I agree with the date. And so I guess my concern is that the lower court excluded instructions that were objected to and appealed on lump sum. And maybe I'm wrong factually, and you should correct me if I am, but my understanding was as of the time of infringement, 1994, the only licenses PCC had entered into were in fact lump sum for these patents, and in fact all of the offers they were making were lump sum. There's no evidence in the record before us of any royalty percentage-based type licenses. Is that right? Here's what happened. Am I misunderstanding the facts, or can you point me to something in the record that contradicts what I'm saying? I can, Your Honor. If you look at the actual agreements, and I think they're in volume three of the appendix, there was one agreement, and that was with NEC, and there were three offers. And all of them have this commonality to them. They were agreements. Point me to the page number you're going to refer to. Oh, yes. Just a second. The NEC agreement, Your Honor, I'm sorry, yes, that is in volume three. The NEC agreement really starts at appendix page 10295. That's a cover letter, and the agreement follows from that. And then another place to probably make a note is one of the offers, and it's consistent. Let's go one at a time. Sure. Since you think that there's something in this that you want me to see that suggests it was not a lump sum. No, well, what happened here is there was a sum of $3 million mentioned in this agreement, but you have to look at what the agreement was for. And if you look at this Court's precedence in the Lucent case and more recently in the WordTek case on can you compare licenses, in other words, the license that is going to take place in a hypothetical negotiation is what I'll call a naked license. It's a license where Fuji would pay money, and then they would get rights to manufacture the camera. The NEC license and the other offers are not that type of license. What those are are product development licenses. At the time, Oro was a company that was in the product development business, and there is a product, and this is referred to specifically in the Genoptic offer, which is in the appendix at some relevant pages at 10341, where what happens is, and I'm now quoting out of Genoptic, where it says PCC will design, develop, and manufacture prototypes of the S400 camera. PCC and Oro, their partner at the time, were in the camera business. This was an agreement where there was a license as part of the agreement. There was a payment of money as part of that, but there was much more. There was a much greater benefit to PCC. They were going to be a camera manufacturing company. I mean, historically what happened was they had this great idea. They came up with it. They got investors. But isn't that all exactly the kind of stuff you would argue to the jury and would go to the weight to give to these licenses, not whether or not the jury should be instructed at all on the possibility of a lump sum? Well, that's the argument on the other side, clearly. And the response to that, I think, is dictated by what this Court said in Lucent and what this Court said in WordTech, where it was incredibly important, and in fact so important that the absence of what I'm going to say as evidence in the record would have prevented that kind of instruction, the evidence being expected use of the patent and expected sales. Both Lucent and WordTech talk about that. There was no evidence in this record of expected future sales that Fuji would have. There was no evidence. Why is that relevant? There's evidence that PCC is offering to three companies lump sum licensing contracts as well as two lump sum executed licensing contracts, and there's no evidence at all that they only did this if and when they could obtain all information available on future sales. I mean, none of that is sort of incorporated into any of these licensing agreements such that it would make us think that it would be improper to use them in this case. If you go back to the core principle involved here, again coming out of this Court's jurisprudence, is if you're going to use licenses in the hypothetical negotiation, which is what they want to do, they have to be comparable to the license that would be negotiated at the hypothetical bargaining table. And the licenses for NEC and the offers to the other were not licenses in any way, shape, or form like the license Fuji would have wanted. Fuji's argument was we get a lump sum, we'll pay $3 million, and then we are off the hook. We can manufacture 10 units or a million units. But there's no limitation in any of these licenses that I can see that limit the number of units. In fact, on page 10344, PCC will design, develop, and manufacture prototypes, deliverables. I mean, I don't see — am I wrong? Is there somewhere in these licenses that restrict to a certain number of units, for example? No, and in fact — Why aren't these bare, naked licenses, since they give the right to make, use, and sell without any limitations on quantity or geography? No, you've hit on exactly an important factual distinction here, Your Honor. PCC was not going to supply an unlimited number of cameras for $3 million. They were going to supply some prototypes and do some development, and then they were going to be a camera manufacturing company pursuant to this agreement where they could have made tens and tens of millions of dollars. They were not obligated — this is a development agreement, and they were not obligated under this agreement to make a million cameras of the S400. Were none of the licenses allowing the licensees or prospective licensees, in the case of offers, to make, use, and sell? There is — I would submit, and I went through these again in detail, obviously, in preparing for this. I would submit there's some ambiguity about just exactly how much of that they could do. There is some relatively broad license language in there, but the context of the entire agreement is it's a product development agreement where PCC is not merely a licensee or licensor. But that would have us ignore the language in the license agreements that allows the licensees to make, use, and sell without limitation. Well, but here's — if you get down to the issue of whether the court should have issued the instruction, there is nothing that would — and there was no testimony in the record, you can search for it — that would compare this license and its terms with the hypothetical license. It was just a, hey, they had a lump sum license for $3 million, therefore Fuji should only have to pay a lump sum of $3 million. That's basically the extent of Mr. Malachowski's testimony in this case. No testimony about, let's walk through the PCC-ORA agreement, and then let's walk through what happens out of the hypothetical. And what's important in the hypothetical negotiation is they get to make a bazillion cameras for $3 million, and they're off the hook, and that's really what's going on here as to what they're trying to do. And they fought us tooth and nail about getting any expected sales information. And I see that I'm out of time. Your time is up. Thank you. Thank you. Your Honor, I know I've used my allotted time. I asked for two minutes. Well, I gave you five, but you can take two. That would be appreciated. Quickly, back to the issue of construing the claims, and in particular the data format claims. One thing I didn't mention is the prosecution history. The prosecution history is clear that the invention that's being discussed is limited to an invention that distinguishes between different architectures or models of computers, and we've pointed the court to that. I apologize. It's in the appendix at 1551-66, but you'll find that it defines the problem that's solved by the patent as being one of architecture incompatibility. It distinguishes the prior art based on the fact that the invention addresses architecture incompatibility, and it then talks about the applicant's improved electronic still camera. So the invention is described as being one that deals with either compatibility with selected models of computers or with devices of different manufacturers. So to put on top of the specification, the prosecution history very much supports our view of the patent. Why don't you quickly turn to your lump sum argument and take a minute to tell me what you think I need to know in response to the other argument. I think what you need to know is that you pretty much understand them right. These are licenses that were given to two parties, offered to three parties. The parties they were offered to were Matsushita, which is Panasonic, Samsung. These were not parties that were taking licenses or being offered licenses so that they could have the inventors of this patent supply them with cameras. These were licenses being offered to do exactly what Fujifilm would have done, which is, if there was an invention here, which Fujifilm didn't think there was, making use of it to produce their own cameras. This is a context in which the hypothetical negotiation, all the evidence points to the fact, would have resulted in a lump sum, and we're not here to say that the lump sum should be required, but certainly the jury should not have been instructed as it was that it could not consider a lump sum. This is a jury that sent out a note saying to the judge, why can't we give a lump sum? And the judge said, you can't. So this is the clearest case of both the evidence supporting a lump sum and actually that being the result had the jury been allowed to consider as it should have. I just can't help but notice, noting that in the re-exam, Mr. Schutz indicated that the examiners on the re-exam agreed completely with Judge Farnon. Not only is it the language that Judge Dyke, you pointed to, but in fact that A9542, what they say is, in light of the disclosure, in light of the specification, a very different interpretation than that adopted by the court must be made. They could not have been more explicit in saying the opposite of what Mr. Schutz just said. They did not agree with Judge Farnon's conclusion, and then they laid out exactly how they saw not only the 459 and the 219 patents, but the 010 and the 899. And finally, Judge Farnon was very clear in his opinion, and this is at the addendum at page 23. As he went through these terms, he defined claim 16 of the 459, and he gave his qualifying language. He then went to other terms, and this is beginning on page 22 of the addendum. He defined terms for the other patents, and he gives separate constructions, but he ends it, the last sentence on page 23 of the addendum, by saying, in addition to all these terms I've just laid out, the clarification that computer apparatus and information handling systems and apparatus are different types within the meaning of the claims if they are loaded with different application software, even if they are otherwise the same, should be added to the constructions of the disputed terms. That phrase gets added to everything in this case. It gets added in his order on claim construction, and the jury takes that in considering the invalidity positions and says, we've got this understanding now that anything goes. And we've pointed this out in our briefs. The arguments that were made were basically, if they've got formats and there are computers in the world, therefore they infringe. That can't be true of any of these patents. That simply can't be true of the 010 or the 899, that any multiple format camera infringes. As I said, if it is, there are lots of cameras that would meet that criteria that predate this camera. Thank you, Your Honor. Thank you, Mr. Lee. Thank you both, counsel, for the basis submitted.